STATE OF MARYLAND *v.* IRVING K. WEST

[No. 258, September Term, 1969.]

*Decided April 6, 1970.*

The cause was argued before MURPHY, C.J., and AN-DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Robert A. DiCicco, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, T. Bryan McIntire, State's Attorney for Carroll County,* and *J. Robert Johnson, Assistant State's Attorney for Carroll County,* on the brief, for appellant.

*Russell R. Reno, Jr.* and *Douglas D. Connah, Jr.* (*Elsbeth Levy Bothe* on the brief) for appellee.

MORTON, J., delivered the opinion of the Court.

The single issue presented in this case involves the constitutionality, *vel non,* of Md. Code, Art. 27, § 20, known generally as the blasphemy statute. The case is before us by virtue of our having granted the State's application for leave to appeal from the order of Judge Edward O. Weant, sitting in the Circuit Court for Carroll County, in which relief was granted the petitioner below under the Uniform Post Conviction Procedure Act, Md. Code, Art. 27, § 645A, on the basis that the Maryland blasphemy statute is violative of the First Amendment to the Constitution of the United States.

The record indicates that the petitioner below was convicted by a local trial magistrate of disorderly conduct, resisting arrest and blasphemy. The fine of $25.00 for disorderly conduct was paid and the sentence of thirty days imprisonment for resisting arrest was served and the $25.00 fine for that conviction paid. After the time for taking an appeal had expired, he filed a Post Conviction petition contesting the legality of his conviction for blasphemy and the imposition of the $25.00 fine and thirty day consecutive jail sentence. Judge Weant found the blasphemy statute to be unconstitutional and set aside petitioner's conviction and sentence. Although the State argues otherwise, we think, under the circumstances here,

the hearing judge had jurisdiction to consider the Post Conviction petition and that the constitutional issue is properly before this Court.

The statute under which the petitioner below was convicted (Md. Code, Art. 27, § 20) provides:

> "If any person, by writing or speaking, shall blaspheme or curse God, or shall write or utter any profane words of and concerning our Saviour Jesus Christ, or of and concerning the Trinity, or any of the persons thereof, he shall on conviction be fined not more than one hundred dollars, or imprisoned not more than six months, or both fined and imprisoned as aforesaid, at the discretion of the court."

The concept underlying the blasphemy statute goes back into Maryland history some 300 years and would appear to have had its origin in a 1649 enactment of the Colonial legislature entitled "An Act Concerning Religion" which provided for punishment "with Death, and Conviscation of Lands and Goods to the Lord Proprietary" of anyone found guilty of committing "Blasphemy against GOD, or denying the Holy TRINITY, or the Godhead of any of the Three Persons * * *."

Over a half century later, the concept of *scienter* was inserted into the law and the penalty provision changed by Chapter 16 of the Acts of 1723 which provided, *inter alia*, that "if any person shall hereafter, within this province, wittingly, maliciously, and advisedly, by writing or speaking, blaspheme or curse God, or deny our Saviour Jesus Christ to be the Son of God, or shall deny the Holy Trinity, the Father, Son and Holy Ghost," he shall upon conviction "for the first offense, be bored through the tongue * * * [and] for the second offense * * * shall be stigmatized by burning in the forehead with the letter B * * * and that for the third offense * * * shall suffer death without the benefit of the clergy."

Except for the penalty provisions,[1] it is apparent that

---

1. The present penalties apparently came into the statute in

the present statute remains in substantially the same form as its predecessor statutes. It is equally apparent that the statute's historical roots, as evidenced by the title of the original Act, were imbedded in the firm conviction of its original and subsequent framers that legislative fiat was necessary and desirable to preserve the sanctity of the Christian religion; and the sanctions invoked by the statute demonstrate the depth and earnestness of their feelings towards the Christian religion.

The First Amendment to the Federal Constitution provides, in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *." Since *Cantwell v. Connecticut*, 310 U. S. 296, the Supreme Court of the United States "has decisively settled" that this mandate of the First Amendment "has been made wholly applicable to the States by the Fourteenth Amendment." *Abington v. School Dist. v. Schempp*, 374 U. S. 203, 215.

While recognizing that "[W]e are a religious people whose institutions presuppose a Supreme Being," *Zorach v. Clauson*, 343 U. S. 306, 313, and that "religion has been closely identified with our history and government," *Schempp, supra*, at 203, the Supreme Court has without equivocation made it clear that "the scope of the First Amendment * * * was designed forever to suppress" the establishment of religion and the prohibition of the free exercise thereof by any State or the Federal Government. *Everson v. Board of Education*, 330 U. S. 1. As enunciated by Mr. Justice Black in *Torcaso v. Watkins*, 367 U. S. 488, 495:

> "We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person to profess a belief or disbelief in any religion. Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and

1860 at the time the General Assembly of Maryland adopted a Code of Public General Laws.

> neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs."

When the power, prestige and support of government is placed behind a particular religious belief, there inevitably occurs a breach of the "wall of separation" which, according to Thomas Jefferson, the framers of the First Amendment intended to erect and forever maintain between Church and State. *Reynolds v. United States,* 98 U. S. 145, 164. In short, the provisions of the First Amendment require the States and the Federal Government to assume a "neutral position" with respect to an individual and his religion. As stated by Mr. Justice Clark in *Schempp, supra,* at 222:

> "The wholesome 'neutrality' of which this Court's cases speak thus stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies. This the Establishment Clause prohibits. And a further reason for neutrality is found in the Free Exercise Clause, which recognizes the value of religious training, teaching and observance and, more particularly, the right of every person to freely choose his own course with reference thereto, free of any compulsion from the State. This the Free Exercise Clause guarantees.
>
> \* \* \*
>
> "The test may be stated as follows: What are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to with-

stand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. *Everson v. Board of Education, supra; McGowan v. Maryland, supra,* at 442. The Free Exercise Clause, likewise considered many times here, withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion. The distinction between the two clauses is apparent—a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended."

Although the State does not, in explicit terms, address its argument to the test formulated in *Schempp,* the thread of its contention, as enunciated in the cases it relies upon, would have us believe that the Maryland blasphemy statute, although conceived as an instrument of the State in aid and support of the Christian religion, has now assumed a secular aura and may be sustained as an effort by the State to enable "those citizens who desire to worship to carry on unmolested" and additionally as an effort to avoid the endangering of the public peace by persons who are incensed or outraged by the blasphemous utterances proscribed by the statute.

It is apparent, however, both from a literal reading of the statute and when considered in its historical setting, that there has not been and could not be, short of legislative action, any infusion of a secular purpose into the statute in its present form. The statute does not purport to relate the blasphemous utterances therein proscribed to the prevention of violence or breaches of the public peace or to enabling persons of the Christian or other

faiths to worship unmolested, or to preserve the orderliness of our society. It plainly and unequivocally makes it a crime for any person to blaspheme or curse God, whether orally or in writing, or to "write or utter profane words of and concerning our Saviour Jesus Christ, or of and concerning the Trinity, or any person thereof * * *." The setting or circumstances in which the writing or utterance occurs is unrestricted. It simply and categorically proscribes such utterances under any and all circumstances.

Patently, the statute was intended to protect and preserve and perpetuate the Christian religion in this State. It obviously was intended to serve and, if allowed to stand, would continue to serve as a mantle of protection by the State to believers in Christian orthodoxy and extend to those individuals the aid, comfort and support of the State. This effort by the State of Maryland to extend its protective cloak to the Christian religion or to any other religion is forbidden by the Establishment and Free Exercise Clauses of the First Amendment. As stated by former Associate Justice Fortas in *Epperson v. Arkansas,* 393 U. S. 97, 103-104: "Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice. It may not be hostile to any religion or to the advocacy of no-religion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."

Having found that the statute is contrary to the terms of the First Amendment's prohibition of laws respecting an establishment of religion or prohibiting the free exercise thereof, we do not reach the question of the statute's asserted vagueness under the Due Process Clause of the Fourteenth Amendment or its alleged violation of the Free Speech Clause of the First Amendment.

*Judgment affirmed.*